TAMIN KHATIB, Plaintiff-Appellant, *v.* ROBERT McDONALD, Defendant-Appellee.

First District (Fifth Division)   No. 79-2292

Opinion filed August 22, 1980.

Philip J. Schmidt, of Chicago, for appellant.

Judge, Drew, Cipolla & Kurnik, Ltd., of Chicago (Jay S. Judge, of counsel), for appellee.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Plaintiff appeals from a jury verdict of $3,000 in a personal injury action and seeks a new trial on the question of damages only, contending

(1) that the award was inadequate as a matter of law; and (2) that the jury's determination of damages was tainted by error (a) in giving an instruction that it was plaintiff's duty to exercise ordinary care to obtain medical treatment, (b) in refusing to exclude evidence concerning a prior accident in which plaintiff was involved, (c) in overruling plaintiff's objections to defense counsel's closing argument concerning the prior accident, (d) in allowing a witness to read nurses' notes written on a hospital chart, and (e) in not allowing plaintiff to introduce testimony concerning his heart condition.

Plaintiff was driving his automobile northbound on Lake Shore Drive in Chicago in the second easternmost lane, with his wife and infant child as passengers. Defendant was driving in the same direction alongside plaintiff, in the easternmost lane. When the two vehicles arrived at the first 90 degree turn of an S-curve, they were traveling approximately eight miles per hour and, at this point, defendant drifted from his lane and struck plaintiff's vehicle twice on the right side. Plaintiff stated that on the first impact his body twisted and struck the left door; and, on the second, the left side of his back struck the armrest. He subsequently brought this action for damages because of personal injuries.

A motion in limine was presented by plaintiff to exclude evidence of (1) his refusal to undergo a myelogram and a laminectomy; and (2) his involvement in a prior automobile accident. However, from the record it appears that there was no bearing or ruling on the motion at that time.

At trial, plaintiff testified that on the date of the occurrence he was employed as a staff manager for National Life and Accident Insurance Company, where he earned an annual salary of $12,000 plus sales commissions; that at the time of the accident he was en route to the home of a prospect, who was also a friend; that after the accident he noted the odor of alcohol on defendant; that after he (plaintiff) got out of his car, he felt numbness in his right leg, pain in his lower back, and after about 15 minutes he started to limp; that a police car arrived but left after calling another car to the scene; that he and his wife then continued on to the "prospect's" house where they remained for about a half hour; that he had difficulty sleeping that night because of pain in his right leg; and that the next morning he had stiffness in his legs and hands and went to the office—but only to deliver paperwork, following which he returned home.

The accident occurred on May 18, 1976, and plaintiff testified that on May 20 he visited Dr. Barazi, who prescribed pills. He saw Dr. Barazi again on May 20—following which, on May 28, he was admitted to Martha Washington Hospital, where he received X rays and physical therapy until June 14, but his condition did not improve; that he complained of his pain daily to hospital personnel; that he was released at his own request after his home was flooded; that afterwards, he saw Dr. Barazi seven times; that Dr.

Barazi prescribed a "stimulator" device, which was not helpful (a bill for the stimulator which plaintiff purchased for $367.50 was admitted into evidence); that he (plaintiff) also visited Dr. Que, who prescribed pills and has given him massages and heat treatments—none of which helped; that he continued receiving treatments from Dr. Que up to the week before trial; that he has pain in his back and leg constantly; that he has refused to undergo a myelogram (a diagnostic procedure) because he is afraid of it; that before the accident, he went to his office on Mondays, Wednesdays and Fridays, but cannot do so now because of pain; that he has not worked at all since the date of the accident; that he uses a cane although he sometimes walks without it for exercise; and that "once in awhile" he will "putter" or barbecue in his back yard.

Defendant, called as an adverse witness under section 60, stated in substance that he was driving home from his job as president of Oak Lawn Trust & Savings Bank when his car swerved out of its lane and twice struck plaintiff's car.

Dr. Edmond Barazi then testified that when he first saw plaintiff, on May 20, he complained of severe pain in his lower back, radiating down to his legs; that he performed a routine physical examination—which included taking his blood pressure and listening to his heart, as well as pressing on his back to determine where he felt pain; that he (Barazi) gave plaintiff a shot to relax the muscles and told him to rest and apply heat to the affected areas for a few days; that when plaintiff experienced no relief, Dr. Barazi had him admitted to Martha Washington Hospital for complete bed rest and "conservative treatment" such as muscle relaxants and physical therapy to relieve stiffness; that X rays showed no bone abnormalities (which indicated only that there had been no previous injury, fracture or disease); that plaintiff was discharged on June 14, with his condition unchanged; that his final diagnosis was whiplash of the lumbar spine and post-traumatic sciatica, caused by the accident; and that his total bill was $265. The hospital invoice in the amount of $2,412.90 was introduced into evidence following which, on cross-examination, Dr. Barazi testified that while he diagnosed sciatica, he could not say for certain whether plaintiff had suffered a herniated disc—which could only be determined by a myelogram; that the notes he made in the hospital records disclosed that when plaintiff was discharged he was "improved and advised to see a doctor on follow-up." During the course of this cross-examination, after defendant's counsel had questioned Dr. Barazi with respect to the physical therapy given, the trial judge inquired as to what the hospital record showed. Defendant's attorney then asked concerning the nurses' notes on each of at least 12 days of plaintiff's hospitalization. The notes, as read aloud by the witness in the presence of the jury, stated that plaintiff slept

well on those days and had complained of pain on only one night. Plaintiff's objection to this testimony was overruled. Dr. Barazi also testified that plaintiff did not limp on his most recent visit.

Dr. Leon Que testified that he first saw plaintiff on February 10, 1977; that plaintiff told him he had been in an automobile accident and, immediately thereafter, felt pain in his back and right leg; that he (Que) gave plaintiff a general physical and basic neurological examination; that plaintiff walked with a limp and exhibited some limitation in the straight leg raising test and obtained a positive reaction, which indicated that "somewhere along the lines the neurological circuit is interrupted or disturbed." Que added that the result of this test is a reflex reaction which could be falsified by the patient; that the positive Babinski test was significant in reaching his final diagnosis; namely, "possibility of a ruptured disc." Que testified further that he repeatedly recommended a myelogram which, on each occasion, was refused; that a myelogram could cause a hemotoma or nerve damage and might even result in death; that if the myelogram revealed a herniated disc, an operation known as a laminectomy would be indicated, which would entail a removal of the disc; that he gave plaintiff ultrasound treatments on five or six occasions, which were intended to relieve muscle spasms; and that plaintiff probably could work and, in particular, do office work; but he cannot sit or drive for long periods of time and should not lift heavy objects. On cross-examination, he testified that a myelogram is regarded as a standard procedure; that a spinal fusion may be necessary after the laminectomy, although that too is a standard operation; that the ultrasound treatments will not improve the herniated disc; and that he lacked sufficient objective information to give an opinion as to whether plaintiff's injury was caused by the accident. On redirect examination, Que stated that plaintiff complained of chest pains in August of 1978 and that an electrocardiogram then taken was normal but, in March of 1979, revealed incomplete repercussion. The trial judge at that point asked Que whether plaintiff's heart condition was a result of the accident. When Que stated that it was not, the trial judge instructed plaintiff's counsel not to proceed further with questions in that regard. Plaintiff's counsel nonetheless asked permission to establish that plaintiff could not undergo a myelogram because of the heart condition. The trial judge again refused, however, stating:

> "The doctor still recommends a myelogram. Obviously, he doesn't feel that his heart can't stand it. He has consistently and continuously recommended a myelogram, you can't say his heart can't stand it."

Dr. Allen Hirschtick then testified that he examined plaintiff on May 4, 1979, at which time plaintiff walked with a cane and a limp; that he ordered

new X rays, which disclosed that although the bones and joints were normal, there was a loss of normal lumbar lordosis which was caused by involuntary muscle spasms; that plaintiff had a complete loss of extension (*i.e.*, he could not bend backwards); that in straight leg raising tests, plaintiff could lift his right leg only 30 degrees and his left leg 60 degrees—while 90 degrees is normal; that his diagnosis was a herniated intervertebral disc; that he is certain of this diagnosis even without the benefit of a myelogram, which is conducted before surgery to show precisely the disc believed to be ruptured; that 15 percent to 20 percent of all herniated discs do not show up in a myelogram; that a myelogram can cause persistent, severe headaches, inflammation of the covering of the spinal cord, or an allergic reaction; that even if a laminectomy is performed, the spine is never the same because much of the disc is lost; that a patient will be totally relieved of pain after a laminectomy only if a very good result is achieved; and that he recommended a laminectomy for plaintiff because his condition would continue to worsen the longer surgery is postponed. On cross-examination, Hirschtick said plaintiff told him he was afraid to undergo a myelogram.

Dr. John Henderson, an economist, testified that in 1975 (the last full year before the accident) plaintiff earned $10,341; that on the date of the accident, plaintiff had an expected work life of 21.3 additional years; and that the present value of plaintiff's expected future earnings at the time of the accident was $254,578. On cross-examination, he testified that his figures did not take into account the fact that 30% of plaintiff's expected income would have been absorbed by business expenses and that, therefore, his actual projected loss was less than the amount stated on direct examination.

Charles Potter, then called by defendant, testified that plaintiff lived in the building next door to him for four years; that in the last two years he had seen plaintiff in his yard; that in the last week, he saw him watering the lawn; that he also observed plaintiff digging in the dirt with a small trowel and had seen him using a shovel; that he had never seen plaintiff limp or use a cane; and that, with respect to plaintiff's gait, in answering a question as to whether it was more accurately described as "a walking or a mope" he stated that he did not know.

Plaintiff, called under section 60, testified he was involved in an accident on December 23, 1974, and, when asked if he sustained injuries to his "neck or back" answered, "Yes, I guess so." Then, on questioning by his own counsel, he said that he was not hospitalized for any injuries and that he did not incur any injury to his lower back.

Defendant testified that he is afflicted with asceptic necrosis, for which he sometimes uses a cane; that he did not use the cane when he walked over to plaintiff's car after the accident; that because he had some difficulty communicating with plaintiff, he may have repeated himself;

that he (defendant) was not drunk that night; that plaintiff did not say he was hurt when they talked; and that plaintiff did not limp at the scene.

The jury returned a verdict for plaintiff in the amount of $3,000, and this appeal followed the denial of plaintiff's post-trial motion.

OPINION

Plaintiff first contends that the damage award of $3,000 was palpably inadequate because it was less than the proven out-of-pocket expenses. Ordinarily, the question of damages is peculiarly one of fact for the jury (*Flynn v. Vancil* (1968), 41 Ill. 2d 236, 242 N.E.2d 237), and the amount of damages awarded by the jury will not be disturbed unless it is palpably inadequate or unless it is clear that the jury disregarded a proven element of damages (*Ward v. Chicago Transit Authority* (1964), 52 Ill. App. 2d 172, 201 N.E.2d 750; *Corsello v. Warren* (1964), 51 Ill. App. 2d 367, 201 N.E.2d 155). It is true that a verdict which is less than the established out-of-pocket expenses may be set aside where there appears to be no question as to their validity or reasonableness (*First National Bank v. Szwankowski* (1969), 109 Ill. App. 2d 268, 248 N.E.2d 517; *Mineiko v. Rizzuto* (1965), 65 Ill. App. 2d 35, 212 N.E.2d 712; *Stroyeck v. A. E. Staley Manufacturing Co.* (1960), 26 Ill. App. 2d 76, 167 N.E.2d 689; *Hong v. Williams* (1955), 6 Ill. App. 2d 456, 128 N.E.2d 655.) However, "[t]he mere fact that the verdict is less than the claimed special damages does not necessarily mean that the award is inadequate even where the defendant has offered no contradictory evidence [since] the jury is free to determine the credibility of the witnesses and to assess the weight to be accorded their testimony." (*Robin v. Miller* (1978), 67 Ill. App. 3d 656, 661, 384 N.E.2d 889, 893.) As was explained in *Haleem v. Onate* (1966), 71 Ill. App. 2d 457, 219 N.E.2d 94:

> "The mathematical computation of bills received and the alleged loss of earnings represent only a part of the total evidence. Therefore, we do not accept the plaintiffs' contention that the sum of the claimed special damages automatically constitutes a minimum level of recovery which is binding upon both the jury and a court of review. Special damages often may be a useful measure; they need not be an incontestable basis in the determination of a proper award.
>
> There are other evidentiary matters to be considered. The testimony surrounding the claimed injuries may have been impeached or it may be contradictory or unreliable. There may be evidence which carries an implication that the injuries have been exaggerated or even feigned or that the medical treatment was either unnecessary or prolonged. There may be evidence which makes doubtful the necessity of the time alleged to have been missed from work. All of these unlike factors must be weighed. And *if there appears to be*

evidence suggesting a genuine conflict as to the legitimacy of the expenses incurred, then the verdict of the jury should not be disturbed on review." (71 Ill. App. 2d 457, 460-61, 219 N.E.2d 94, 96.) Also see *Ryan v. Hoffman* (1972), 7 Ill. App. 3d 621, 288 N.E.2d 255; *Zielinski v. Goldblatt Brothers, Inc.* (1969), 110 Ill. App. 2d 248, 249 N.E.2d 245.

■■ In the instant case, there was testimony as to the following expenses—hospital bill, $2,412.90; Dr. Barazi, $365; Dr. Que, $165; and $367.50 for the stimulator. However, the fact that the jury verdict is less than even those "out-of-pocket" expenses does not require a reversal, since there was evidence indicating questions as to whether plaintiff's injury was as extensive as he claimed and whether all of the medical expenses were necessary. We are aware of plaintiff's testimony that he was jostled about in the accident; that he has had pain in his back and leg constantly; that his symptoms were not relieved at all by his hospital stay or by the stimulator prescribed by Dr. Que; that he does not believe he can work because of his pain; and that he sometimes uses a cane. Likewise, we are cognizant of the diagnoses of post-traumatic sciatica attributable to the accident by Dr. Barazi, of a possible ruptured disc by Dr. Que, and of a herniated disc by Dr. Hirschtick, as well as the latter's opinion that plaintiff's condition will deteriorate unless a laminectomy is performed. We also note, however, that there is evidence of only a glancing contact of the vehicles with minor damage and that there was other testimony indicating that plaintiff's injury was not as severe as the above diagnoses might suggest. In this regard, Dr. Barazi stated that plaintiff's condition upon his release from the hospital was improved and that he did not limp during his last visit; Dr. Que testified that plaintiff is capable of doing office work as long as he is not required to sit for extended periods of time or lift heavy objects; and Charles Potter (plaintiff's neighbor) testified that he had seen plaintiff in his yard digging with a small trowel and using a shovel and had never seen plaintiff limp or use a cane. Finally, we note that while plaintiff said he experienced pain and numbness shortly after the occurrence, defendant said plaintiff did not limp or complain of any injury at the scene and that plaintiff did not see a doctor until two days after the accident. In addition, there is some confusion in the medical testimony. For example, Dr. Que testified that the positive reaction on the Babinski test was a significant factor in his diagnosis of a possible ruptured disc, whereas, Dr. Hirschtick stated that a Babinski test would not reveal such an injury. Also, while Dr. Hirschtick was positive in his diagnosis of a herniated disc without a myelogram, Dr. Que and Dr. Barazi testified that only through a myelogram could a positive diagnosis be made. Thus, in light of the evidence tending to minimize the extent of plaintiff's injury as well as the contradictions in the medical testimony, there appears to be a genuine conflict as to

the extent of plaintiff's injuries, his ability to work, and (to some extent) the legitimacy of his expenses. Under such circumstances, the award of damages should not be disturbed solely on the basis that it was less than "out-of-pocket" expenses.

Plaintiff also maintains, however, that numerous trial errors tainted the jury's deliberation and brought an inadequate verdict. He first argues that "the court erred in instructing the jury pursuant to Defendant's instruction number 5 * * * relative to the duty to mitigate damages." The instruction in question stated:

> "In fixing the amount of money which will reasonably and reasonably compensate the plaintiff, you are to consider that an injured person must exercise ordinary care to obtain medical treatment, and that damages resulting from a failure to exercise such care cannot be recovered." Illinois Pattern Instructions, Civil, No. 33.01 (2d ed. 1971).

■■ All that is required in order to justify giving an instruction is that there be some evidence in the record to support the theory set out in the instruction. (*Figarelli v. Ihde* (1976), 39 Ill. App. 3d 1023, 351 N.E.2d 624; *Biggerstaff v. New York, Chicago & St. Louis R.R. Co.* (1957), 13 Ill. App. 2d 85, 141 N.E.2d 72.) Here, we note a myelogram was recommended by Dr. Que and a laminectomy by Dr. Hirschtick, who also said that plaintiff's condition would only worsen if the operation was not performed. Plaintiff has refused to undergo either a myelogram or a laminectomy and, under such circumstances, it was for the jury to decide whether his refusal to do so was unreasonable.

Plaintiff next argues that the trial court "erred in allowing over objection, and in overruling a motion in limine with respect to, evidence of" a previous accident in which plaintiff was involved. While plaintiff moved in limine to exclude evidence as to certain matters, the record disclosed no ruling on that motion before trial. It does appear, however (and the parties so state in their briefs) that, at the close of plaintiff's case, the trial court denied that portion of the motion in limine which sought to exclude evidence of a prior accident on December 23, 1974, on the basis that plaintiff had received no injuries in that occurrence. During the colloquy leading to that denial, defendant's counsel informed the court that plaintiff had made a claim against Hartford Insurance Company because of an accident in California on December 23, 1974; that the claim was settled for $1,900; that he proposed to ask plaintiff "if he was involved in an accident on December 23, 1974, and if he sustained some neck or back injuries." The court denied the motion to exclude, and defendant's counsel asked plaintiff on his section 60 examination whether he was involved in an accident on that date with a Lion's Cleaners truck and, after he answered in the affirmative, plaintiff was asked, "Did you have or claim injuries to your

neck or back?"—to which he answered, "Yes, I guess so." He later clarified this by stating that he injured his shoulder and not his lower back. Then, in closing argument, the court overruled plaintiff's objection to a comment by defense counsel that plaintiff "had another neck *and* back injury." (Emphasis added.)

The rule in Illinois is clearly to the effect that in a personal injury action, evidence as to prior similar injuries is admissible as being probative on the issue on the amount of damages and extent of injuries. (*Myrtle v. Checker Taxi Co.* (7th Cir. 1960), 279 F.2d 930; *Marut v. Costello* (1964), 53 Ill. App. 2d 340, 202 N.E.2d 853, *aff'd* (1966), 34 Ill. 2d 125, 214 N.E.2d 768.) In *Marut v. Costello*, defendant claimed that plaintiff's injuries had been caused by a prior accident and, in reversing, the court stated:

> "The first accident required three operations upon the cervical spine. The instant one required three major operations upon the lower back or lumbar area. At no point was there any connection shown between the two accidents. There was nothing shown to prove or disprove this proposition. Hence, we must hold that the cross-examination amounted to reversible error as not being on the principal element of this cause of action." 34 Ill. 2d 125, 128, 214 N.E.2d 768, 769.

■■ In the instant case at the time of its ruling, the trial court had no information either from the record, from defense counsel, or from any other source, that the prior accident involved similar injuries to plaintiff. Indeed, defense counsel informed the court that he knew only that plaintiff had been involved in a California accident but did not know whether he had been injured and, more particularly, he did not state that if plaintiff denied any similar injury he would be able to present evidence thereof. Thus, we believe the trial court should have granted the motion to exclude and should not have permitted defense counsel to inquire whether plaintiff had been in an accident at a particular time and place and whether he had injuries to his neck or back at that time. While it would have been proper to have made a general inquiry as to whether plaintiff had ever injured his lower back at any time prior to the occurrence involved in the instant action, there was no connection shown or alleged between the two accidents to permit the questions in the form asked. (See *Marut v. Costello*.) They were in the nature of a foundation for impeachment, and it is improper to ask such questions implying the existence of facts which counsel is not prepared to prove later in the trial. (*Jacobson v. National Dairy Products Corp.* (1961), 32 Ill. App. 2d 37, 176 N.E.2d 551.) Here, the question carried the implication that plaintiff had injured his lower back in the prior accident which defendant had informed the court he could not prove.

■■ We agree with plaintiff that the trial court improperly overruled his

objection to the comment by defense counsel in closing argument that plaintiff had "another neck and back injury and I didn't have the full details on it." Statements of fact not based on the evidence may not properly be argued to the jury. (*People v. Beier* (1963), 29 Ill. 2d 511, 194 N.E.2d 280.) In the instant case, there was no evidence of both neck and back injuries in the prior accident; thus, the comment should not have been made and the objection thereto was improperly overruled.

■■ Plaintiff next asserts error in allowing Dr. Barazi to read, over objection, the nurses' notations in a hospital record. We initially note that a hospital record is not admissible as a business record (Supreme Court Rule 236), and hospital record entries are generally not admissible without testimony by the person who made the entries thereon. (*Messina v. Zody* (1973), 13 Ill. App. 3d 566, 300 N.E.2d 851; *In re Estate of Rupinski* (1970), 131 Ill. App. 2d 393, 266 N.E.2d 190.) Here, plaintiff had testified to complaints of pain every day while in the hospital and Dr. Barazi then testified that plaintiff had pain during his hospital stay for which he received muscle relaxants and daily physical therapy treatments. During Dr. Barazi's cross-examination, defense counsel had the hospital records marked for identification and, even though he answered negatively when asked by defense counsel, "Are the nurses' notes something you make reference to to see how the patient is doing?" Dr. Barazi was asked, over objection, to read and testify to the entries of nurses. In this manner, counsel brought out that on most of the days during his hospital stay the nurses' notes showed "no complaints."

■■ In *Adkins v. Blue Bird Coach Lines, Inc.* (1960), 27 Ill. App. 2d 34, 169 N.E.2d 368 (abstract), it was held that a doctor's testimony concerning nurses' entries in a hospital record did not come within any of the exceptions to the hearsay rule and was inadmissible. Here also, this line of questioning did not come within any of the hearsay exceptions. It is clear that there was no attempt to show past recollection recorded or to refresh recollection and, indeed, they could have been shown as the entries were not made by Dr. Barazi. Neither was there any attempt to establish a foundation for the admissibility of this testimony under the impeachment or admissions exceptions to the hearsay rule. It thus appears that the nurses' entries read by Dr. Barazi from the hospital records were inadmissible hearsay, and we conclude that the trial court erred in overruling the objection thereto.

Plaintiff finally argues the court erred in refusing to allow testimony from Dr. Que regarding his heart condition. On his redirect examination of the doctor, plaintiff's attorney brought out that plaintiff first complained to the doctor on August 11, 1978, about chest pains; that the first electrocardiogram taken at that time was normal, but the second (taken on March 9, 1979) indicated incomplete repercussion which was consistent with angina pectoris, for which he prescribed medicine. At this point, an objection was

made and, when Dr. Que answered a question by the court that the heart condition was not the result of the accident, the objection was sustained. ▪▪ Plaintiff now states this ruling was erroneous because he wanted to show that the heart condition "would be a factor in considering a myelogram or operation." The record, however, discloses no such statement made to the trial court and, in any event, even if it had been made, there was no offer of proof that the witness would testify that plaintiff should not be given a myelogram or undergo an operation because of his heart condition. We note also that plaintiff did not testify that his refusal to accept these procedures was related to the condition of his heart; rather, he said only that he was afraid of them. In view thereof, we reject plaintiff's contention that the court erred in sustaining an objection to further questions concerning plaintiff's heart condition.

We are thus confronted with the crucial question as to whether the errors of the trial court in denying the exclusion of the prior accident, in overruling the objection to the statement of defense counsel in closing argument that plaintiff had injured his back and neck, and in allowing Dr. Barazi to read over objection from the hospital record the notes of the nurses, are sufficient to require a new trial. The object of review is not to determine whether the record is completely free of error, but to ascertain whether upon the trial there has been such error as might prejudice the rights of a party (*Harlan E. Moore & Co. v. Champaign National Bank* (1957), 13 Ill. App. 2d 232, 246, 141 N.E.2d 97), and the ultimate question facing a reviewing court is whether there was reasonable basis for a conclusion that but for the errors assigned, the verdict might have been different (*Harlan E. Moore & Co. v. Champaign National Bank*).

▪▪ In the instant case, there was testimony concerning medical expense totaling over $3,000, as well as to a substantial loss of income resulting from plaintiff's alleged inability to work. Nevertheless, the jury awarded damages of only $3,000 and, in view of the fact that there appears to have been no question as to liability, it appears clear the jury's award could only have resulted from its belief that plaintiff was not injured in the manner and to the extent claimed, and we are of the opinion that such a belief necessarily was influenced by the errors set forth above. Plaintiff testified to a low back injury, and there was medical testimony from three doctors supporting his complaints—including Dr. Hirschtick, who diagnosed the herniated intervertebral disc, and stated that with or without his recommended laminectomy there would be permanent impairment of function. The jury, however, was improperly informed that plaintiff had been in a prior accident involving a truck, from which he might have received a neck or back injury. From this information, it is possible that the jury inferred that he had injured his lower back in the prior accident, and this possibility was

accentuated by the improper comment of defense counsel in closing argument that plaintiff had injured his neck and back in that prior accident. Moreover, there can be no question that the improper reading of the necessary entries in the hospital record (indicating a lack of complaints of pain by plaintiff during his hospitalization) tended to minimize the extent of his injury and also could and likely did influence the jury on its determination of damages. Thus, it is our opinion these errors prejudiced the rights of plaintiff and that he is entitled to a new trial.

We turn then to the contention of plaintiff that a retrial should be only as to the issue of damages. In this regard, the court in *Paul Harris Furniture Co. v. Morse* (1956), 10 Ill. 2d 28, 139 N.E.2d 275, stated:

> "[E]ither a trial or an appellate court may set aside an inadequate verdict and order a new trial solely on the issue of damages in a proper case, that is, in a case where the damage issue is so separable and distinct from the issue of liability that a trial of it alone may be had without injustice. * * *
>
> * * * [A] court is not justified in ordering a new trial on the issue of damages alone where it appears that the damages awarded by the jury were the result of a compromise on the question of liability." 10 Ill. 2d 28, 46, 139 N.E.2d 275, 286.

■■ In the instant case, it is uncontroverted that plaintiff was traveling in the second lane and, while making a turn on an S-curve, his car was struck twice on the right side by defendant's car. This was plaintiff's testimony, and defendant stated that he was in the outer lane when his car swerved out of its lane and twice hit plaintiff's car, which was in the second lane. These facts clearly establish negligence on the part of defendant; indeed, his counsel in closing argument stated, "You're probably going to have to find on behalf of the plaintiff on the cause of the accident." Defendant does not contend that plaintiff was contributorily negligent, and the record discloses no evidence thereof. Neither is there anything in the record to indicate that the damages awarded were the result of a compromise on the question of liability, and we thus are of the opinion that plaintiff is entitled to a new trial as to damages only.

■■ In so holding, it will be necessary that we pass on two additional matters mentioned in the parties' briefs. First, it is established that where evidence of circumstances surrounding an accident is relevant to the possible extent of personal injuries, it is admissible even when liability is admitted. (*Phillips v. Lawrence* (1967), 87 Ill. App. 2d 60, 230 N.E.2d 505.) Thus, because evidence of the speed of the vehicles and the nature of the impacts here is relevant to the extent of injury, it should be admissible upon the retrial. Second, evidence as to offers of settlements or negotiations therefore are inadmissible as such, although admissions as to other

facts made during settlement discussions may be admissible. As stated in *Lipschultz v. So-Jess Management Corp.* (1967), 89 Ill. App. 2d 192, 200, 232 N.E.2d 485, 489:

> "We agree with the basic premise that evidence of offers and negotiations for settlement are ordinarily inadmissible. Nevertheless, we believe these exhibits come within the rule set forth in *Nelson v. Union Wire Rope Co.*, 31 Ill. 2d 69, 199 N.E.2d 769 (1964), where the court said (p 115):
>
>> 'As a general rule any statement, written or not, made by a party or in his behalf which is inconsistent with his present position may be introduced in evidence against him.' "

Plaintiff's reliance on *Smothers v. Cosgrove-Meehan Coal Co.* (1932), 264 Ill. App. 488, as authority to allow him to introduce the dollar amounts involved in settlement negotiations is misdirected. In *Smothers*, there was an admission by defendant during settlement negotiations as to the amount of coal it had wrongfully appropriated. The court held that this admission was properly introduced into evidence; but, in *Smothers*, there was no attempt to introduce the dollar amounts discussed during settlement negotiations.

For the reasons stated, the judgment is reversed and this cause is remanded with directions to enter an order granting a new trial consistent with the content of this opinion.

Reversed and remanded with directions.

LORENZ and MEJDA, JJ., concur.