KAY HINNEN, Plaintiff-Appellant, v. WILLIAM BURNETT, Defendant-Appellee.

Fifth District    No. 5—85—0252

Opinion filed July 1, 1986.—Rehearing denied July 29, 1986.

Lon D. Weaver, of East Alton, for appellant.

Dan A. Shaffer, of Bernard & Davidson, of Granite City, for appellee.

JUSTICE HARRISON delivered the opinion of the court:

Plaintiff, Kay Hinnen, filed an action to recover damages for personal injuries she sustained when the rear of her automobile was struck by a pickup truck driven by defendant, William Burnett. Defendant admitted liability. Following a jury trial in the circuit court of Madison County, plaintiff was awarded $2,500 for past medical expenses. The court denied plaintiff's motion for a new trial and entered judgment on the jury's verdict. Plaintiff now appeals, contending that the court should have ordered a new trial because the jury's verdict did not include amounts for lost wages, disability, and pain and suffering and was therefore inadequate. For the reasons which follow, we reverse and remand with directions.

The legal standards applicable to this appeal are well established. The decision as to whether a new trial should be granted rests with the sound discretion of the trial court, and its ruling will not be reversed absent an abuse of that discretion. (*Beckmeyer v. Alcala* (1985), 135 Ill. App. 3d 166, 173, 481 N.E.2d 893, 897.) As a general rule, a new trial should not be granted in a personal injury action on the ground that the damages are too small. (*Nicholl v. Scaletta* (1982), 104 Ill. App. 3d 642, 647, 432 N.E.2d 1267, 1272.) This is particularly true where, as here, no complaint is made as to the jury instructions or admissibility of evidence, and the trial was otherwise error free. (*Haleem v. Onate* (1966), 71 Ill. App. 2d 457, 460, 219 N.E.2d 94, 96.) Nevertheless, justice requires that the jury's verdict be set aside and a new trial ordered where the amount of damages awarded is palpably inade-

quate (*Beckmeyer v. Alcala* (1985), 135 Ill. App. 3d 166, 172, 481 N.E.2d 893, 897) or against the manifest weight of the evidence, or where the jury has clearly disregarded a proven element of damages (*Montgomery v. City of Chicago* (1985), 134 Ill. App. 3d 499, 502, 481 N.E.2d 50, 53.)

In reviewing the adequacy of a jury's verdict, the record as a whole must be considered. (*Beckmeyer v. Alcala* (1985), 135 Ill. App. 3d 166, 173, 481 N.E.2d 893, 897.) The record here shows that defendant's pickup truck backed into plaintiff's automobile, a 1974 Ford Thunderbird, as she was waiting to leave a gas station in Pontoon Beach. The collision broke one of the rear taillights of plaintiff's car. Plaintiff also claimed that her car's trunk and bumper were dented, but defendant testified that he observed only a scratch on the bumper. Defendant's truck sustained no significant damage. Plaintiff described the collision as a "pretty good jolt." According to defendant, it was a "minor impact." Following the collision, the parties exited their vehicles and spoke to one another about the accident. Plaintiff stated that she then returned to her car; drove to her bank, where she apparently had personal business; and went home.

The accident occurred on Friday, November 23, 1979. At that time plaintiff was employed as a "foreperson" by Chromalloy Chemical Company. She described her duties as follows:

> "I watched—set up the lines, made sure that everything was there for them to run, checked the products, worked on the lines at times, and if I had to, lift and move around in different ways, and at times drive a forklift."

Although plaintiff stated that she started having "a little bit of feeling in my neck" the day after the accident, she returned to work at Chromalloy the following Monday and worked four nine-hour days that week. During the course of the week she noticed the "feeling" getting "a little worse and a little worse until Thursday I called the doctor and set up an appointment for him for Friday." Plaintiff said that by the time she went to the doctor's office, "I could not hold my head up straight. It was more or less laid over my shoulder."

The doctor to whom plaintiff referred was Norman Claybourn, a medical doctor board certified in industrial medicine. Plaintiff first saw Dr. Claybourn on November 30, 1979, at his office in Granite City. Dr. Claybourn did not appear personally at the trial, but his deposition was read into evidence. He stated at that deposition that he had no independent recollection of his treatment of plaintiff and could only testify based on his notes. Those notes indicated that plaintiff came to him complaining of neck pain (whiplash), especially on the right side. Dr.

Claybourn had made a notation that there was "not much trauma" which he interpreted to mean that he "did not see any external signs of trauma, such as contusion, abrasion, lacerations." He prescribed Robaxin, a muscle relaxant, and Myroflex, a liniment which plaintiff was to apply to her neck and shoulder area.

Dr. Claybourn next saw plaintiff on December 3, 1979. At that time he noted that plaintiff was "no better." He recommended that she undergo physical therapy on an outpatient basis at St. Elizabeth's Medical Center in Granite City and called that facility to make the necessary arrangements. He also prescribed Tylenol with codeine, a pain reliever. This was followed by another office visit on December 7, 1979, when Claybourn changed his prescription from Tylenol with codeine to Darvocet N 100, another type of pain reliever containing Darvon, "a synthetic codeine-like product." He also continued the Robaxin. Thereafter, Dr. Claybourn saw plaintiff once a week for four weeks, once a month for two months, then only at irregular intervals. The dates of these visits and the corresponding notations made by Claybourn in his records are summarized below:

| Date | Notation |
| --- | --- |
| December 14, 1979 | Improved. Not well. Continue Rx. |
| December 21, 1979 | Continue therapy. Improving. |
| December 28, 1979 | Improving slowly. Continue therapy. |
| January 11, 1980 | Improving. Release to work. |
| February 12, 1980 | No real complaint. Now and then some pain. |
| March 19, 1980 | No real complaint regarding neck. Still occasional pain in the right side of neck. Reflexes okay. |
| June 13, 1980 | Reflexes okay. Pain in the neck still now and then. Get cervical spine x-rays for comparison. |
| July 1, 1980 | (No visit.) X-rays of cervical spine taken at St. Elizabeth's and interpreted by G. W. Miller, M.D. No abnormality visualized. |
| July 8, 1980 | Good range of motion. X-rays okay. Release from observation. |

After July 8, 1980, Dr. Claybourn did not see or treat plaintiff again in connection with injuries sustained in her collision with defendant. In a letter dated October 3, 1980, he stated: "It is my opinion that this patient [plaintiff] suffered from acute cervical strain from this accident. It is also my opinion that she has recovered." Claybourn inter-

preted "acute" to mean "it's short in duration, lasting less than two weeks." Finally, although the notation of January 11, 1980, indicated that Dr. Claybourn had released plaintiff to work, he testified that he could not remember having actually kept her off work or that she had asked to be excused from work.

Evidence was adduced regarding the physical therapy which Dr. Claybourn arranged for plaintiff at St. Elizabeth's. Plaintiff stated that she received two one-hour therapy sessions per day, one in the morning and one in the afternoon, over a six-week period. Except for this therapy, plaintiff claimed she spent the entire six-week period in bed or on the couch. The therapy was administered by Patricia Burns, a physical-therapy assistant. Burns, who was called as a witness by the defense, testified that she maintained written charts which recorded the type of treatment plaintiff received and her progress. Those charts were admitted into evidence and showed that plaintiff's treatment commenced on December 4, 1979. An entry made by Burns on December 11, 1979, stated in part: "Patient [plaintiff] complained of having a severe headache including the right side of neck and face. She feels it may be from overworking yesterday refinishing her daughter's bed & dresser." On January 8, 1980, Burns reported: "She [plaintiff] voices no complaints of pain but states it [her neck] becomes stiff after being active." Burns' final entry was made on January 11, 1980. It indicated that treatment was being discontinued, plaintiff was returning to work, a "home program" had been discussed, and plaintiff's goal of reduction or relief of neck pain had been achieved.

After being released from observation by Dr. Claybourn on July 8, 1980, plaintiff sought no further medical treatment for her neck pain until May 22, 1981, when she visited Dr. Barrett Lee Coleman, an orthopedic surgeon from East St. Louis. Dr. Coleman testified by deposition that plaintiff complained to him of "neck pain, headache, stiffness of the neck, inability to sleep and a tightness or lump-type sensation on the right side of the neck." The only objective finding he made was that plaintiff had a muscle spasm in her neck. He diagnosed her as having cervical strain and muscle spasms. As had Dr. Claybourn, he prescribed Tylenol with codeine for the pain, Robaxin and Myroflex. He also told her to apply warm compresses to the sore areas.

Dr. Coleman saw plaintiff only once more, on June 21, 1981. Plaintiff's complaints were the same, and Coleman kept her on the same medication. He testified that his findings were consistent with plaintiff having had an auto accident in November of 1979. Indeed, he went so far as to say that the accident was "most possibly" the cause of plaintiff's neck problems. He later admitted, however, that his opinion was

based solely on plaintiff's complaints and his examination. He was not aware of the type of work plaintiff did and agreed that lifting or strenuous exercise of work could also cause muscle spasms. According to Dr. Coleman, plaintiff exhibited no neurological abnormalities and required no surgery. When he last saw her in 1981, be believed that she would probably have muscle spasms for the next six to nine months, requiring periodic pain medication and muscle relaxants, and thought that her condition was one which "could probably clear up" within three years of the accident.

Despite Dr. Coleman's prognosis, plaintiff testified that she still had a knot on her neck and continued to experience episodes of pain up to the time of trial. She admitted, however, that she was involved in two more accidents following the one at issue here. In 1982 she hit her head and part of her back on a door while operating a forklift at work. In 1984 she drove her car into another automobile in a parking lot. In addition, plaintiff testified that the pain did not prevent her from doing anything that she had done before the 1979 accident with defendant. She said only that it made household chores and painting more difficult and that because of it, her attempts at bowling and helping her husband install drywall "didn't work." Plaintiff adduced no medical evidence concerning her condition since 1981. She explained that she had not gone back to a doctor because she felt that she could cope with the situation herself.

Plaintiff documented a total of $2,047.22 in expenses for medical care relating to her neck injury, including doctor fees, X rays, physical therapy and medicine. She claimed that she could not work for the entire six-week period during which she was receiving physical therapy and lost $1,343.82 in wages. In addition, she sought compensation for her pain and suffering and disability. Taking into account these various elements of damage, she argued that she should be awarded a total of $33,397.02. After nearly seven hours of deliberation, the jury rendered this verdict.

"We, the Jury, find for the plaintiff and against the defendant. We assess the plaintiff's damages as follows:

(a) For disability resulting from the injuries $ 0 ;

(b) For pain and suffering experienced and reasonably certain to be experienced in the future as a result of the injuries $ 0 ;

(c) For medical expenses incurred in the past as a result of the injuries $2,500.00;

(d) For the value of earnings lost $ 0 ."

Because plaintiff received no award for lost wages, she failed

even to recover all of her claimed special damages. She therefore contends that the jury's verdict must be declared inadequate as a matter of law. We disagree. The mere fact that a verdict is less than the special damages or out-of-pocket expenses claimed does not necessarily mean that the award is inadequate. (*Montgomery v. City of Chicago* (1985), 134 Ill. App. 3d 499, 502, 481 N.E.2d 50, 53.) Although the mathematical computation of bills received and earnings lost may often be a useful measure for the determination of the proper award, it does not automatically constitute a minimum level of recovery which is binding upon both a jury and a court of review. (*Montgomery v. City of Chicago* (1985), 134 Ill. App. 3d 499, 503, 481 N.E.2d 50, 53; *Beckmeyer v. Alcala* (1985), 135 Ill. App. 3d 166, 173, 481 N.E.2d 893, 897.) As our court recently observed:

> " 'There are other evidentiary matters to be considered. The testimony surrounding the claimed injuries may have been impeached or it may be contradictory or unreliable. There may be evidence which carries an implication that the injuries have been exaggerated or even feigned or that the medical treatment was either unnecessary or prolonged. There may be evidence which makes doubtful the necessity of the time alleged to have been missed from work. All of these and like factors must be weighed. And if there appears to be evidence suggesting a genuine conflict as to the legitimacy of the expenses incurred, then the verdict of the jury should not be disturbed on review. The jury has the function of determining the credibility of witnesses and the weight to be given their testimony. It is usually instructed to consider all of the evidence in light of its own experience in the affairs of life. This prerogative should not be withdrawn from the jury if there is any evidence tending to support its conclusion as to the amount of damages actually sustained. Thus this court has said that it will affirm verdicts, however low, which are sustained by evidence or the absence of particular evidence.' " 135 Ill. App. 3d 166, 173, 481 N.E.2d 893, 897-98, quoting *Haleem v. Onate* (1966), 71 Ill. App. 2d 457, 461, 219 N.E.2d 94, 96.

■ In this case there was a genuine conflict as to the legitimacy of plaintiff's claim for lost wages. Her assertion that she could not go to her job while undergoing physical therapy was completely uncorroborated. Dr. Claybourn could not recall telling her that she should stay home, and he arranged for her therapy sessions to be administered on an outpatient basis, so she was never confined to the hospital. The treatments were given in Granite City, where plaintiff lived. While her

place of employment was in St. Louis, the jury could have concluded that she should have scheduled the treatments so that she could receive them before and after work. Moreover, as previously noted, the charts kept by Patricia Burns, the physical-therapy assistant, reported that plaintiff was able to refinish furniture, thus contradicting plaintiff's statements that she had to remain in bed or on the couch for the full six weeks that the therapy lasted. Under these circumstances, the jury had ample reason to conclude that her hiatus from work was not a necessary result of the accident.

■ There was likewise a genuine conflict as to the nature and extent of plaintiff's disability and pain and suffering. Our summary of the evidence has shown that the collision caused negligible damage to the parties' vehicles. (Compare *Beckmeyer v. Alcala* (1985), 135 Ill. App. 3d 166, 174, 481 N.E.2d 893, 898.) Plaintiff was able to complete her errands immediately after the collision and returned to work the following week, putting in four nine-hour days on a job which involved lifting and moving and operation of a forklift. (Compare *Bledsoe v. Amiel* (1978), 57 Ill. App. 3d 54, 55-56, 372 N.E.2d 1033, 1034-35.) Plaintiff admitted that the pain in her neck did not prevent her from doing anything she had done before the accident, although she experienced difficulty with certain activities such as housework and painting and apparently could not bowl or hang drywall. (Compare *Beckmeyer v. Alcala* (1985), 135 Ill. App. 3d 166, 174-75, 481 N.E.2d 893, 898-99.) She did not claim to have been impaired in her ability to do her job or to have missed any work because of her injuries after January of 1980. Except for the muscle spasm observed by Dr. Coleman a year and a half after the collision, all of her medical treatment was based on her subjective complaints. Dr. Coleman's original testimony linked the spasm to the collision, but he later agreed that such spasms could also be caused by lifting or strenuous work or exercise and stated that he had not known the nature of plaintiff's work. Coleman estimated the probable recovery period of plaintiff's condition to be within three years of the accident. Patricia Burns reported that plaintiff had achieved her goal of reduction or relief of neck pain by January 11, 1980. Dr. Claybourn released plaintiff from observation in July of 1980, and in a letter written later that year stated that she had recovered. (Compare *Giddings v. Wyman* (1961), 32 Ill. App. 2d 220, 223, 177 N.E.2d 641.) Plaintiff sought no medical treatment for injuries relating to this case between July of 1980 and May of 1981. The last time she saw a doctor in connection with such injuries was June of 1981. The case was tried in February of 1985. In the meantime, plaintiff was involved in two more accidents. In view of these conflicts in the evi-

dence, we believe that the jury had the right to conclude that the disability and pain and suffering experienced by plaintiff because of the collision with defendant were at most minimal and hence, insufficient to require or support an economic evaluation thereof. *Kelley v. Cross* (1967), 79 Ill. App. 2d 342, 347, 223 N.E.2d 555, 557.

■ There are two additional problems, however, which nevertheless render the jury's verdict infirm. First, although the jury awarded nothing for pain and suffering, it did compensate plaintiff for the full amount of her expenses for pain medication and physical therapy. To this extent, the verdict is irreconcilably inconsistent. If the jury believed that plaintiff had no compensable pain and suffering, its award of pain-related expenses was wholly unwarranted and contrary to the manifest weight of the evidence. Conversely, if it believed that plaintiff's pain and suffering were sufficiently serious to warrant expenditures for pain medication and physical therapy, its failure to award her compensation for that pain and suffering means that it disregarded a proven element of damages.

A similar inconsistency appears in *Williams v. McCallister* (1978), 60 Ill. App. 3d 635, 376 N.E.2d 1093, where the plaintiff in an automobile "whiplash" case was awarded only the expenses for her medical treatment, which included injections for pain and physical therapy, and received nothing for pain and suffering. (See also *Ford v. Baker* (1978), 61 Ill. App. 3d 45, 377 N.E.2d 853; *Bledsoe v. Amiel* (1978), 57 Ill. App. 3d 54, 372 N.E.2d 1033; *Giddings v. Wyman* (1961), 32 Ill. App. 2d 220, 177 N.E.2d 641.) There, however, the question of the verdict's inconsistency was never addressed by the court. We are aware of no case in which such an inconsistency has been directly sanctioned. To the contrary, our supreme court has recently held that where verdicts are returned in the same action which are legally inconsistent, the verdicts should be set aside and a new trial granted. *Wottowa Insurance Agency, Inc. v. Bock* (1984), 104 Ill. 2d 311, 316, 472 N.E.2d 411, 413.

Second, although plaintiff proved only $2,047.22 in medical expenses, the jury awarded her $2,500 for those expenses. Counsel suggested at oral argument that the excess could represent amounts which the jury thought plaintiff was likely to expend in the future, but this contention is untenable. The itemized verdict form completed by the jury specifically provided that the award was to cover only medical expenses incurred in the past. Because an itemized form was used, we cannot presume that the excess was intended to compensate plaintiff for some other element of damage. To the extent of this excess, the jury's award for medical expenses was therefore contrary to the manifest weight of the evidence.

For the foregoing reasons, we hold that the trial court abused its discretion in denying plaintiff's motion for a new trial. Accordingly, the judgment of the circuit court of Madison County is reversed, and the case is remanded for a new trial on the issue of damages.

Reversed and remanded with directions.

WELCH, J., concurs.

JUSTICE JONES, dissenting:

I respectfully dissent.

The majority finds an inconsistency in the verdict returned by the jury in this case because the jury awarded the plaintiff an amount for pain medication but did not award the plaintiff any damages for pain and suffering. The majority states that it finds no case that sanctions the inconsistency in awarding damages for pain medication but no damages for the pain itself.

There are, in fact, many cases that sanction an award of damages for pain medication and treatment but no award of damages for pain and suffering. Those cases are fully viable on the point although they do not discuss the apparent digression in terms of an "inherent inconsistency." One need not look far to find cases of such sanction. The majority opinion itself cites four of them: *Williams v. McCallister* (1978), 60 Ill. App. 3d 635, 376 N.E.2d 1093 (where the instruction to the jury directed them to allow damages for pain and suffering, but they did not, despite ample testimony by plaintiff regarding such), *Ford v. Baker* (1978), 61 Ill. App. 3d 45, 377 N.E.2d 853, *Bledsoe v. Amiel* (1978), 57 Ill. App. 3d 54, 372 N.E.2d 1033, and *Giddings v. Wyman* (1961), 32 Ill. App. 2d 220, 177 N.E.2d 641. Other cases of a similar nature could be cited.

Pain and suffering attend practically every claim for damages for personal injury, and it is certain that the jury is instructed in every case that they are a proper element of damages to be awarded. In every instance where a jury sees fit to award damages in the amount of the special damages proved, it could be argued that the verdict was "inherently inconsistent," but the cases do not support such a conclusion. Rather, the explanation for such a jury verdict is generally found in the evidence. As recently stated by this court in *Beckmeyer v. Alcala* (1985), 135 Ill. App. 3d 166, 173-74, 481 N.E.2d 893, 897:

> "Contrary to what plaintiffs argue, they are not entitled, as a matter of right, to automatic compensation for the amount of special damages or out-of-pocket expenses claimed. As stated in

*Haleem,* special damages often may be a useful measure, but they need not be an incontestable basis for the determination of a proper award. Mathematical computations represent only a part of the total evidence.

'There are other evidentiary matters to be considered. The testimony surrounding the claimed injuries may have been impeached or it may be contradictory or unreliable. There may be evidence which carries an implication that the injuries have been exaggerated or even feigned or that the medical treatment was either unnecessary or prolonged. There may be evidence which makes doubtful the necessity of the time alleged to have been missed from work. All of these and like factors must be weighed. And if there appears to be evidence suggesting a genuine conflict as to the legitimacy of the expenses incurred, then the verdict of the jury should not be disturbed on review. The jury has the function of determining the credibility of witnesses and the weight to be given their testimony. It is usually instructed to consider all of the evidence in the light of its own experience in the affairs of life. This prerogative should not be withdrawn from the jury if there is any evidence tending to support its conclusion as to the amount of damages actually sustained. Thus this court has said that it will affirm verdicts, however low, which are sustained by evidence or the absence of particular evidence. *Daly v. Vinci,* 51 Ill. App. 2d 372, at 386, 201 N.E.2d 200, at 207 (1964). In *Jeffrey v. Chicago Transit Authority,* 37 Ill. App. 2d 327, 185 N.E.2d 384 (1962), a rear-end collision case, we affirmed a verdict of no damages where the plaintiffs' testimony was impeached and self-contradictory and the testimony of the treating physician could have been deemed unworthy of belief.' *Haleem v. Onate* (1966), 71 Ill. App. 2d 457, 461, 219 N.E.2d 94, 96.''

It seems obvious to me that the plaintiff's evidence regarding her injury and her pain was questionable to the point of disbelief and that the jury so found when it returned this conservative but wholly justified verdict.

The case of *Wottowa Insurance Agency, Inc. v. Bock* (1984), 104 Ill. 2d 311, 472 N.E.2d 411, relied upon by the majority, involved two inconsistent verdicts rendered upon two separate counts of a complaint, and, accordingly, it cannot serve as a precedent for the single verdict in this case which the majority has found, I believe erroneously, to be "inherently inconsistent."